2018 BNH 011      Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                                                          Bk. No. 16-11056-BAH
                                                                                                Chapter 13
Joanne C. Evarts,
        Debtor


*Peter S. Wright, Jr., Esq.*
*University of New Hampshire School of Law*
*Civil Practice Clinic*
*Concord, New Hampshire*
*Attorney for Debtor*

*Marcus Pratt, Esq.*
*Korde & Associates, P.C.*
*Lowell, Massachusetts*
*Attorney for U.S. Bank Trust National Association,*
*As Trustee of the Bungalow Series III Trust*


## MEMORANDUM OPINION

### I.  INTRODUCTION

On November 21, 2016, Nationstar Mortgage ("Nationstar") filed a proof of claim in this case (POC 2-1) on behalf of Federal National Mortgage Association ("FNMA") asserting that Joanne C. Evarts (the "Debtor") owed FNMA a total of $237,948.91 as of July 19, 2016 (the "Petition Date").  POC 2-1 indicated the Debtor's prepetition default totaled $24,449.62.  On April 26, 2017, the Debtor filed an objection to POC 2-1 (Doc. No. 41) (the "Objection") contending that the documentation supporting FNMA's claim was incomplete, inaccurate, and incomprehensible, and raising issues about charges for escrow, hazard insurance, and the proper amount of outstanding principal.  FNMA filed a response to the Objection on May 30, 2017 (Doc. No. 43) disputing the Debtor's contentions.  At the parties' request, the hearing on the

Objection was continued several times while the parties pursued settlement discussions. When it became clear the matter would not settle, the Court scheduled an evidentiary hearing. Before the hearing was held, FNMA transferred its claim to U.S. Bank Trust National Association, as Trustee of the Bungalow Series III Trust ("U.S. Bank") (Doc. No. 100); thus, U.S. Bank now holds the claim to which the Debtor objects, and is the real party in interest.

The Court held an evidentiary hearing on the Objection on September 13, 2018, at which the Debtor and a representative of U.S. Bank's servicer, BSI Financial Services, testified. After the hearing, the parties submitted memoranda of law (Doc. Nos. 116 and 117). The Court took the Objection under advisement. This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire. This is a core proceeding in accordance with 28 U.S.C. § 157(b).

**II. FACTS**

By way of background, the Court notes that the Debtor, along with her (now deceased) husband, previously filed a chapter 7 bankruptcy petition with this Court on July 8, 2005 (Bk. No. 05-12681-JMD, Doc. No. 1).[1] That case converted to chapter 13 on July 24, 2006 (Bk. No. 05-12681-JMD, Doc. No. 188). The Debtor's chapter 13 plan was confirmed on May 22, 2007 (Bk. No. 05-12681-JMD, Doc. No. 242). It called for payment of a prepetition mortgage arrearage claim totaling $9,292.00 (Bk. No. 05-12681-JMD, Doc. No. 235), which is the amount listed on proof of claim 5-1 (POC 5-1) filed by the mortgagee on August 17, 2006 (Bk. No. 05-

---

[1] The Court can take judicial notice of its own dockets. LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st Cir. 1999) (cited in Reed v. Zak (In re Zak), 573 B.R. 13, 19 n.3 (Bankr. D. Mass. 2017)).

12681-JMD, POC 5-1). POC 5-1 further indicated that the Debtor and her husband owed a total of $212,985.00 on their mortgage. The term of the Debtor's chapter 13 plan was thirty-six months. The Debtor intended to fund a large portion of the plan from the success of unrelated pending litigation.

That funding never came to fruition. Instead, on August 28, 2011, while the Debtor's chapter 13 case remained pending, the mortgagee amended its claim (POC 5-2). POC 5-2 reduced the prepetition mortgage arrearage claim to $143.46 and increased the total claim to $235,932.74. The itemization attached to POC 5-2 gave the Debtor a postpetition credit of $9,148.60 toward the previously disclosed prepetition arrearage of $9,292.06 on account of a "Loan Modification Adjustment." Attached to POC 5-2 was a copy of a "Home Affordable Modification Agreement," bearing the signatures of the Debtor and her husband in May 2010, and showing on page 3 a "Deferred Principal Balance" of $54,267.14 and a "New Principal Balance" of $235,932.74 on their mortgage loan (the "May Loan Modification Agreement"). The same page 3 of the May Loan Modification Agreement contained a handwritten note initialed by "JCE" stating the first loan modification payment would be due "June 1, 2010 per loan modification department." The Debtor never challenged POC 5-2 during the course of her 2005 bankruptcy case. The Debtor received her discharge in the chapter 13 case on February 11, 2013 (Bk. No. 05-12681-JMD, Doc. No. 334). Ultimately, the mortgagee received $143.46 through the Debtor's plan (Bk. No. 05-12681-JMD, Doc. No. 372), which amount was in accord with POC 5-2.

The Debtor filed a second bankruptcy case on July 19, 2016 (Doc. No. 1). On Schedule D, she listed the claim of her mortgagee as totaling $236,232.14, and indicated this claim was disputed. In the chapter 13 plan that the Debtor filed with the petition (Doc. No. 2), the Debtor stated her mortgage was not current. She proposed paying Nationstar $19,750.00 on account of a

3

prepetition mortgage arrearage. The Debtor amended her plan on September 9, 2016 (Doc. No. 13); it continued to provide the same treatment of the mortgagee's prepetition mortgage arrearage claim. This plan was confirmed by the Court on October 12, 2016 (Doc. No. 19).

On November 21, 2016, after the plan was confirmed, Nationstar filed POC 2-1 on behalf of FNMA. POC 2-1 indicated that the claim was based upon a promissory note and mortgage dated June 19, 2002. It did not refer to the modification of the Debtor's loan that took place in 2010. No loan modification agreement was attached to the claim form. The Mortgage Proof of Claim Attachment to POC 2-1 reflects the following debt calculation in Part 2:

| Principal balance | $219,624.69 |
|---|---|
| Interest due | $5,580.63 |
| Fees, costs due | $2,114.11 |
| Escrow deficiency for funds advanced | $10,629.48 |
| Total debt | $237,948.97 |

It also contained the following prepetition arrearage calculation in Part 3:

| Principal & interest due | $7,951.26 |
|---|---|
| Prepetition fees due | $2,114.11 |
| Escrow deficiency for funds advanced | $10,629.48 |
| Projected escrow shortage | $3,754.77 |
| Total prepetition arrearage | $24,449.62 |

The Debtor filed the Objection in response to POC 2-1.

At an evidentiary hearing held on September 13, 2018, the Debtor testified at length concerning the history of the mortgage and its restructuring. She stated that she and her husband initially applied for a modification of their mortgage loan in 2009. She stated that they were offered a trial period plan pursuant to which they were required to make payments of $1,066.34 per month for January, February, and March 2010. Ex. 13. The Debtor and her husband successfully completed the trial period plan, and in March they received a "Home Affordable Modification Agreement," which they executed on March 30, 2010 (the "March Loan

4

Modification Agreement"). Ex. 1. The March Loan Modification Agreement indicated the "New Principal Balance" on the loan was $181,665.60; it did not reflect any "Deferred Principal Balance."

The Debtor further testified that the mortgagee contacted her in May 2010 and informed her that there was an error with the March Loan Modification Agreement as it had not been signed by a representative of the mortgagee within the time permitted. According to the Debtor, the mortgagee indicated that it just needed the Debtors to re-sign the signature pages. Upon questioning by the Debtor, the mortgagee indicated that the agreement would not be different from the March Loan Modification Agreement; it would be the same document. The Debtor testified that she only received the signature pages for the agreement and did not see the entire May Loan Modification Agreement until sometime in 2015.

While the Debtor testified that the only portion of the May Loan Modification Agreement that she received in 2010 was the signature pages, the Court has discovered a document in the written record that belies that testimony. Interspersed with U.S. Bank's copy of the May Loan Modification Agreement (Ex. 106) is a letter the Debtor sent to Nationstar dated May 10, 2010, which states in full:

> 18 Butternut Dr.
> Cornish, NH 03745
> May 10, 2010
>
> Dear Nationstar,
>
> When we had still not received our papers back, signed by you folks, by April 29, 2010, I called your office. Your Loan Modification Department said the papers had an error & had to be redrawn, so we should pay $1,066.34 for 5/1/2010. We did so, sending overnight; you received that payment by 4/30/2010.
>
> The enclosed papers reached us by May 3, 2010. We have adjusted on page 3 to reflect your direction that 5/1/2010 would be $1,066.34 (and was paid as such), with the new amount beginning June 1, 2010.
>
> Sincerely,
> James C West
> Jemima? Evans

Ex. 106. A copy of the May Loan Modification Agreement containing the Debtor's handwritten changes on page 3 of the agreement, noted above in the Debtor's May 10, 2010, letter, was filed with the Court on August 28, 2011, in the Debtor's prior bankruptcy case as part of POC 5-2:

6

3. **The Modification.** If my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on **MAY 1, 2010** (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a workout plan or trial period plan, this modification will not take effect. The first modified payment will be due on **MAY 1, 2010**. ⟶ *June 1, 2010 per loan modification department. JCE*

   A. The new Maturity Date will be: **APRIL 1, 2050**.

   B. The modified principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan. The new principal balance of my Note will be $ **235,932.74**  (the "New Principal Balance"). I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid interest that is added to the outstanding principal balance, which would not happen without this Agreement.

   C. $ **54,267.14**  of the New Principal Balance shall be deferred (the "Deferred Principal Balance") and I will not pay interest or make monthly payments on this amount. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is $ **181,665.60** . Interest at the rate of **2.000** % will begin to accrue on the Interest Bearing Principal Balance as of **APRIL 1, 2010** and the first new monthly payment on the Interest Bearing Principal Balance will be due on **MAY 1, 2010** . My payment schedule for the modified Loan is as follows:

POC 5-2; Ex. 109.  The Debtor and her husband separately signed the signature page now affixed to the May Loan Modification Agreement just a couple of days after the date of the May 10, 2010 letter:

7

_Jeremiah Evarts_
**JEREMIAH EVARTS** — -Borrower
Date May 14, 2010

_Joanne Evarts_
**JOANNE EVARTS** — -Borrower
Date May 12, 2010

_____ -Borrower
Date

_____ -Borrower
Date

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT - Single Family - Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT                                    Form 3157 3/09 (rev. 8/09)
FALPS# F3157-7 Rev. 09-09-09                                         (page 7 of 8)

[Space Below This Line for Acknowledgments]

STATE OF Vermont                COUNTY OF Windsor

The foregoing instrument was acknowledged before me this 14Th of May 2010 by
**JEREMIAH EVARTS AND JOANNE EVARTS**

Signature of Person Taking Acknowledgment _Karla M Kruse_
Printed Name _Karla M. Kruse_
Title or Rank _Notary Public_
Serial Number, if any _____

8

As the Court notes above, the new provisions concerning the "Deferred Principal Balance" of $54,267.14 and the "New Principal Balance" of $235,932.74 appear on page 3, just below the Debtor's handwritten notes, making it unlikely that she was unaware until years later that the May Loan Modification Agreement was capitalizing all of the then-existing contractual mortgage arrearages and deferring their payment until a later date, rather than (as she contends) forgiving the entire amount of the Deferred Principal Balance. Thus, it would appear that the Debtor did in fact have a copy of the full May Loan Modification Agreement at the time she and her husband signed it in May 2010. There is no other explanation in the record for the Debtor's handwritten notes appearing on the very same page of the agreement that contains the Deferred Principal Balance, which Nationstar attached as an exhibit to POC 5-2 filed in the Debtor's prior bankruptcy case on August 28, 2011.

### III.  DISCUSSION

**A.  Applicable Law Regarding Filing and Allowance of Claims**

The filing and allowance of creditor claims in bankruptcy are governed by 11 U.S.C. §§ 501 and 502. Am. Express Bank, FSB v. Askenaizer (In re Plourde), 418 B.R. 495, 502 (B.A.P. 1st 2009) (citing Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co., 549 U.S. 433 (2007)). Pursuant to § 501(a), creditors are entitled to file a proof of claim against a debtor's bankruptcy estate. Plourde, 418 B.R. at 502. Pursuant to § 502(a), a proof of claim is deemed allowed unless a party in interest objects. Id. at 502-03. Even where a party in interest objects, the bankruptcy court must allow the claim unless one of the exceptions set forth in § 502(b) applies. Id. at 503.[2]

---

[2] "Failure to file a proof of claim meeting the requirements of Bankruptcy Rule 3001 and Official Form 10 is not among [the nine listed bases for disallowing claims]." Plourde, 418 B.R. at 504 n.12.

> The Bankruptcy Code itself does not prescribe what documentation, if any, must accompany a proof of claim. However, the Federal Rules of Bankruptcy Procedure, which provide the procedural framework for the filing and allowance of claims, regulate the form, content, and attachments for proofs of claim. Bankruptcy Rule 3001(a) requires that a proof of claim be a written statement that conforms substantially with ''the appropriate Official Form,'' which is Official Form 10.[3] Bankruptcy Rule 3001(c) directs creditors filing a proof of claim ''based on a writing'' to attach either the original or a duplicate of the writing.

Id.

Official Form 410 instructs claimants to "[a]ttach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements." Official Form 410; see Plourde, 418 B.R. at 503-04. It further requires the claimant to specify whether the claim includes ''any interest or other charges" and, if so, to attach a statement ''itemizing interest, fees, expenses, or other charges as required by Bankruptcy Rule 3001(c)(2)(A)." Official Form 410; see Plourde, 418 B.R. at 504. Bankruptcy Rule 3001(c)(2) provides:

> In a case in which the debtor is an individual:
>
> (A) If, in addition to its principal amount, a claim includes interest, fees, expenses, or other charges incurred before the petition was filed, an itemized statement of the interest, fees, expenses, or charges shall be filed with the proof of claim.
>
> (B) If a security interest is claimed in the debtor's property, a statement of the amount necessary to cure any default as of the date of the petition shall be filed with the proof of claim.
>
> (C) If a security interest is claimed in property that is the debtor's principal residence, the attachment prescribed by the appropriate Official Form shall be filed with the proof of claim. If an escrow account has been established in connection with the claim, an escrow account statement prepared as of the date the petition was filed and in a form consistent with applicable nonbankruptcy law shall be filed with the attachment to the proof of claim.

---

[3] The Court notes that Official Form 10 was superseded by Official Form 410 on December 1, 2015. http://www.uscourts.gov/forms/bankruptcy-forms/proof-claim.

>(D) If the holder of a claim fails to provide any information required by this subdivision (c), the court may, after notice and hearing, take either or both of the following actions:
>
>(i) preclude the holder from presenting the omitted information, in any form, as evidence in any contested matter or adversary proceeding in the case, unless the court determines that the failure was substantially justified or is harmless; or
>
>(ii) award other appropriate relief, including reasonable expenses and attorney's fees caused by the failure.

Fed. R. Bankr. P. 3001(c)(2).

>Bankruptcy Rule 3001(f) sets the evidentiary effect of a properly filed proof of claim (i.e., one that complies with the requirements of the rule and form), stating that a claim "filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f); see also In re Long, 353 B.R. 1, 13 (Bankr. D. Mass. 2006) (citing Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.), 993 F.2d 915, 925 (1st Cir.1993)).
>
>In order to rebut the prima facie evidence a proper proof of claim provides, the objecting party must produce "substantial evidence" in opposition to it. See In re Long, 353 B.R. at 13; see also United States v. Clifford (In re Clifford), 255 B.R. 258, 262 (D. Mass. 2000). If the objection is substantial, the claimant "is required to come forward with evidence to support its claims … and bears the burden of proving its claims by a preponderance of the evidence." Tracey v. United States (In re Tracey), 394 B.R. 635, 639 (1st Cir. BAP 2008) (citing In re Organogenesis, Inc., 316 B.R. 574, 583 (Bankr. D. Mass. 2004)).

Plourde, 418 B.R. at 503-04.

>Thus, a claimant establishes a prima facie case against a debtor upon the execution and filing of a proof of claim in accordance with the bankruptcy rules; the objecting party is then required to produce evidence to rebut the claimant's prima facie case; once the objecting party produces such rebuttal evidence, the burden shifts back to the claimant to produce additional evidence to prove the validity of the claim by a preponderance of the evidence. In re Colonial Bakery, Inc., 108 B.R. 13, 15 (Bankr. D.R.I. 1989) (cited in In re Pontarelli, 169 B.R. 499, 501 (Bankr. D.R.I. 1994)). See also In re Narragansett Clothing Co., 143 B.R. 582, 583 (Bankr. D.R.I. 1992). The ultimate burden of proof always rests upon the claimant. Colonial Bakery, 108 B.R. at 15.

Notinger v. Auto Shine Car Wash Sys., Inc. (In re Campano), 2002 BNH 030, 9.

### B. The Objection to POC 2-1

U.S. Bank's predecessor in interest filed POC 2-1 in this case on November 21, 2016. As explained above, POC 2-1 is deemed allowed unless a party in interest objects. The Debtor did

11

object to POC 2-1. However, even though the Debtor objected, the Court must allow POC 2-1 unless one of the nine exceptions set forth in § 502(b) applies. The Debtor has not identified, in either the Objection or her post-trial memorandum, under what subsection of § 502(b) she seeks disallowance of U.S. Bank's claim. Presumably, the Debtor seeks to disallow the claim under § 502(b)(1) on the theory that the claim is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1). Specifically, the Debtor raises three issues with U.S. Bank's claim. First, she objects to U.S. Bank's inclusion of $54,267.14 of deferred principal which she contends improperly inflated the New Principal Balance of her loan in the May Loan Modification Agreement to $235,932.74. Second, she objects to U.S. Bank's inclusion of $8,400.00 in charges for forced placed insurance during 2013. Third, she objects to U.S. Bank purportedly overcharging the escrow account $15,588.00 from February 2009, through the Petition Date.

### 1. Deferred Principal

The Debtor has not articulated any legal basis for challenging the validity of the May Loan Modification Agreement that she signed, which sets forth that $54,267.14 would be treated as deferred principal to be paid later according to the terms of the agreement. It appears that the Debtor may be arguing that there was "no meeting of the minds"[4] regarding the terms of the May Loan Modification Agreement, as she contends that she did not see the entire May Loan Modification Agreement until May 2015—a contention belied by Exhibits 106 and 109. Or it may be that the Debtor is arguing that the mortgagee committed some sort of fraud by switching the actual agreement. However, the letter that the Debtor sent to Nationstar in May 2010, along

---

[4] In New Hampshire, a contract is valid and enforceable if there is an "offer, acceptance, consideration, and a meeting of the minds." Durgin v. Pillsbury Lake Water Dist., 153 N.H. 818, 821 (2006). A meeting of the minds occurs when the parties assent to the same contractual terms. Id. The agreement must be "manifest … based upon an objective standard." Id.

12

with the signed, annotated and initialed copy of the May Loan Modification Agreement filed with the Court in 2011, convinces the Court that the Debtor did have the full agreement when she executed the May Loan Modification Agreement—or, at the very latest, before August 2011, when Nationstar attached it to POC 5-2—refuting her contention that she was unaware of its deferred principal provision until 2015[5] or that the mortgagee somehow tricked her into signing it.[6]

The Court notes further that a provision in the March Loan Modification Agreement (which is also contained in the May Loan Modification Agreement) required the Debtor and her husband to re-execute the agreement under the following conditions:

> I agree … [t]hat I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Plan <u>if an error is detected after the execution of this Agreement.</u> I understand that a corrected Agreement will be provided to me and this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrected Agreement, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by the Agreement, and I will not be eligible for a modification under the Home Affordable Modification Program.

Ex. 107 at ¶ 4(K) (emphasis added); <u>see also</u> Ex. 106 at ¶ 4(K). Further, paragraph 2(B) of the March Loan Modification Agreement provided in relevant part:

> I understand that the Loan Documents will not be modified unless and until (i) I receive from the Lender a copy of this Agreement signed by the Lender, and (ii) the Modification Effective Date . . . has occurred.

---

[5] "A party that has the opportunity to read documents but fails to do so, cannot thereafter complain that the documents do not reflect the parties' agreement." <u>Beckett v. Wells Fargo Bank Nat'l Ass'n</u>, Civil Action No. 11-40093-TSH, 2013 WL 2155314, at *2 (D. Mass. May 16, 2013).

[6] The Court notes further that even if the Debtor could establish such claims, which she has not clearly articulated, they are likely barred by the relevant statute of limitations. <u>See, e.g.</u>, <u>Beckett</u>, 2013 WL 2155314, at *2 (noting that the statute of limitations accrues at the time of injury, which in that case was the date the refinancing closed, and concluding that a claim for fraud was barred by Massachusetts' three-year statute of limitations).

Ex. 107 at ¶ 2(B).  It is undisputed that the mortgagee never signed the March Loan Modification Agreement.  The Debtor also agreed in the May Loan Modification Agreement:

> That this Agreement shall supersede the terms of any modification, forbearance, Trial Period Plan or Workout Plan that I previously entered into with Lender.

Ex. 106 at ¶ 4(B).

Given that the Debtor was required to execute the May Loan Modification Agreement per the March Loan Modification Agreement, and given that the Debtor failed to timely challenge the legal effect of that May Loan Modification Agreement, or to explain why she is not bound by the terms of that contract, the Court finds that the Debtor has not met her burden of coming forward with "substantial evidence" that would rebut U.S. Bank's prima facie case regarding the validity and amount of the Deferred Principal Balance contained in POC 2-1.  While the Debtor spent a great deal of time at the hearing and in her post-trial memorandum challenging the basis for the Deferred Principal Balance figure, the time to question the elements of the $54,267.14 figure was before she signed the May Loan Modification Agreement and agreed to repay it, not seven years later in her second bankruptcy filing.[7]

Accordingly, the Court overrules the Objection to the extent the Debtor challenges the Deferred Principal Balance component.  The Deferred Principal Balance remains collectible in accordance with the terms of the May Loan Modification Agreement and is a proper component of U.S. Bank's total claim in POC 2-1.

---

[7] U.S. Bank contends that the Debtor could and should have raised any issues with the May Loan Modification Agreement in her prior bankruptcy case by objecting to POC 5-2; no objection to POC 5-2 was ever filed by the Debtor, her husband, the chapter 13 trustee, or any other party in interest.  Accordingly, that claim was allowed as filed.  U.S. Bank does not explicitly contend that the Debtor is barred from raising those issues in this proceeding and its pleadings fail to cite any legal authority for doing so.

### 2. Insurance Charges

The Debtor has also raised an issue regarding "serious overcharging for forced placed insurance during the year 2013." The Debtor does not point to any evidence of overcharging in the itemization attached to POC 2-1, i.e., the Mortgage Proof of Claim Attachment, but rather she directs the Court's attention to Nationstar's "detail transaction history" dated May 10, 2017, showing transactions between November 29, 2012, and September 26, 2013. Ex. 10. This report purportedly shows advances and disbursements for hazard insurance totaling $9,807.00,[8] of which the Debtor contends $8,400.00[9] was for "duplicate" or "forced placed" insurance. It is not clear from the itemization that the Debtor was actually charged these amounts. In fact, the Court notes that the entries for March 19, 2013, April 9, 2013, May 7, 2013, June 17, 2013, and June 18, 2013, which total $4,204.00 are all described as "HAZARD SFR ADVANCE" and "HAZARD SFR DISBURSED," while the entries for September 25, 2013, in the amount of $4,204.00, are described as "HAZARD SFR DEPOSIT" and "RECOVER ESCROW

---

[8] The "detail transaction history" lists items for "HAZARD SFR ADVANCE," "HAZARD SFR DISBURSED," "HAZARD SFR DEPOSIT," and "RECOVER ESCROW ADVANCE" on the following dates in the following amounts:

| Date | Amount |
|---|---|
| 1/04/13 | $1,399.00 |
| 3/19/13 | $1,421.73 |
| 4/09/13 | $347.793 |
| 5/07/13 | $347.79 |
| 6/17/13 | $347.79 |
| 6/18/13 | $1,738.90 |
| 9/25/13 | $4,204.00 |
| Total | $9,807.00 |

The Debtor contends the charge on January 4, 2013, for $1,399.00 was for payment of hazard insurance obtained by the Debtor. She contends the other six charges were for unnecessary "duplicate" or "forced placed" insurance.

[9] The Court notes that the charges in footnote 8 that the Debtor contends were for "duplicate" or "forced placed" insurance actually total $8,408.00, which the Debtor appears to have rounded down to $8,400.00 in her post-trial memorandum.

15

ADVANCE."  Because the amounts for the entries from March 19, 2013, to June 18, 2013, exactly total the amount shown for September 25, 2013, it is quite possible that the entry for September 25, 2013, which is described differently than the others, is in fact a reversal of the amounts purportedly disbursed on the earlier dates in 2013.  There is no running total in the "detail transaction history" presented by the Debtor, which would aid the Court in making this determination.

Further, as U.S. Bank points out, none of the insurance charges about which the Debtor complains are reflected in the documentation attached to the claim at issue, i.e., POC 2-1.  The itemization attached to POC 2-1 begins on October 1, 2013, a few days after the "detail transaction history" ends.  U.S. Bank explains that the itemization begins on the October date because the Debtor's first delinquency occurred on October 1, 2013, and Part 5 of the Mortgage Proof of Claim Attachment form indicates that the loan payment history should be "from the First Date of Default."  POC 2-1 at 4.

Despite the Debtor's request that the Court consider the "detail transaction history" as evidence of the mortgagee's overcharging the Debtor, she herself is unsure that this purported overcharging is even reflected in U.S. Bank's bankruptcy claim.  Doc. No. 116 at 5 ("To the extent the $8,400.00 overcharge is reflected in the arrearage claimed by Nationstar, it should reduce the stated arrearage set forth in Proof No. 2.") (emphasis added).  As described above, U.S. Bank's prepetition mortgage arrearage claim consists of the following components:

| Principal & interest due | $7,951.26 |
| --- | --- |
| Prepetition fees due | $2,114.11 |
| Escrow deficiency for funds advanced | $10,629.48 |
| Projected escrow shortage | $3,754.77 |
| Total prepetition arrearage | $24,449.52 |

The itemization attached to POC 2-1 begins on October 1, 2013, and thus does not reflect any of the purported charges for "duplicate" or "forced placed" insurance identified by the Debtor. All of the "duplicate" or "forced placed" insurance charges predate the itemization attached to POC 2-1. U.S. Bank further explains that as of October 1, 2013, the itemization reflects that the Debtor had a <u>positive</u> $3,350.76 in her escrow account; in other words, the Debtor's escrow account had $3,350.76 to disburse toward hazard insurance premiums and real estate taxes. Thus, if there were overcharging to the extent alleged by the Debtor, one would expect the escrow account to have a <u>negative</u> balance as of October 1, 2013. Considering all of this together, the Court finds that the Debtor has not set forth "substantial evidence" with respect to insurance charges to rebut U.S. Bank's prima facie claim with respect to its prepetition mortgage arrearage claim.

### 3. Overcharging Escrow Account

The Debtor contends that her escrow account was overcharged $15,588.00 from February 2009, through July 2016 (the month the Debtor filed bankruptcy), as detailed in Exhibit 15. The Court has reviewed Exhibit 15. The Debtor's analysis of her escrow account begins in February 2009. As noted above, U.S. Bank's itemization begins on October 1, 2013, since that date is the date of the Debtor's first delinquency under the May Loan Modification Agreement according to U.S. Bank. Thus, there is nothing for the Court to compare with regard to the pre-delinquency charges. As also noted above, as of October 1, 2013, the Debtor's escrow account had a positive balance of $3,350.76. If U.S. Bank's predecessor in interest had overcharged the Debtor before this date, the Court would expect to see a negative escrow account balance, but it does not.

The Court is able to compare the escrow entries on Exhibit 15 with U.S. Bank's itemization attached to POC 2-1, for the dates between October 7, 2013, and July 1, 2016. The Debtor's analysis shows that U.S. Bank disbursed a total of $33,550.00 from October 2013,

through July 2016, for escrow items, i.e., insurance and real estate taxes. This matches the itemization attached to POC 2-1 almost exactly. U.S. Bank's itemization shows that U.S. Bank disbursed $33,500.00 since October 1, 2013. The small discrepancy between the two accountings relates to the insurance charge for November 2015. The Debtor's analysis shows that $1,871.00 was disbursed while the mortgagee shows that $1,821.00 was disbursed.

The Debtor's analysis further shows that she made payments to the escrow account totaling $20,876.00 from October 2013, through July 2016. Thus, by the Debtor's own analysis, there was an escrow shortage of $12,674.00 ($33,550.00 less $20,876.00), between October 2013, and July 2016. POC 2-1 sets forth an escrow deficiency of only $10,629.48, so <u>less than</u> what the Debtor asserts for the same time frame (by $2,044.52). Given that, the Court cannot find that the Debtor has presented "substantial evidence" that would rebut the prima facie evidence presented in U.S. Bank's claim regarding the outstanding escrow amount due as of the petition date. Thus, the Court finds no basis to reduce the arrearage amount in POC 2-1.

Accordingly, the Court overrules the Objection to the extent the Debtor challenges the escrow deficiency set forth in U.S. Bank's claim. For that reason, the $10,829.48 for "escrow deficiency for funds advanced" set forth in POC 2-1 remains collectible and is a proper component of U.S. Bank's prepetition mortgage arrearage claim of $24,449.62.

## IV.  CONCLUSION

For the reasons outlined above, the Court finds that the Debtor has not established grounds for disallowing U.S. Bank's claim pursuant to § 502(b). Accordingly, the Objection is overruled. POC 2-1 is allowed in the total amount of $237,948.91, with a prepetition mortgage arrearage claim of $24,449.62. This opinion constitutes the Court's findings of fact and

conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate order consistent with this opinion.

ENTERED at Concord, New Hampshire.


Date:   December 12, 2018            /s/ Bruce A. Harwood
                                     Bruce A. Harwood
                                     Chief Bankruptcy Judge